No. 13-35291 & 13-35322

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

In the Matter of:
RUPANJALI SNOWDEN,
Debtor

---

RUPANJALI SNOWDEN,
Appellant,

v.

CHECK INTO CASH OF WASHINGTON, INC.,
Appellee.

---

Appeal from the United States District Court
for the Western District of Washington
D.C. No. 2:12-cv-01095-RSL
Hon. Robert S. Lasnik

———————————

APPELLANT'S RESPONSE AND REPLY BRIEF

———————————

Christina L. Henry, Esq.
Jacob DeGraaff, Esq.

*Attorneys for Appellant,*
*Rupanjali Snowden*

HENRY, DeGRAAFF &
McCORMICK, P.S.
183 North 105th Street
Suite 220
Seattle, Washington 98133
(206) 330-0595 Telephone
(206) 400-7609 Facsimile

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................2

TABLE OF AUTHORITIES ........................................................3

COUNTER-STATEMENT OF FACTS ON CROSS-APPEAL .........................5

    A.   Snowden Did Not "Threaten" CIC ....................................5

    B.   Snowden Did Not Act Improperly By Listing CIC as a Creditor At the Address At Which It Lent Her Money ....................................5

    C.   Snowden Was Not Obligated To Inform CIC's Collection Agents About Her Bankruptcy Filing ....................................6

    D.   Check Into Cash Misconstrues the Facts To Impeach Snowden's Claim of Emotional Distress ....................................6

    E.   Check Into Cash Falsely and Maliciously Accuses Snowden Of Committing the Crime Of Bribery ....................................9

SUMMARY OF THE ARGUMENT .....................................................9

ARGUMENT .........................................................................11

    I.   Check Into Cash Fails to Demonstrate That Snowden Does Not Deserve Fees or Sanctions ....................................11

        A.   The Court's Decision in *Sternberg v. Johnston* Regarding Attorneys' Fees Is Invalid and Must Be Overturned ....................................11

        B.   11 U.S.C. § 362(k) Is a Fee-Shifting Statute ....................................17

        C.   CIC is Wrong About *Sternberg*'s Applicability to Snowden ..........22

        D.   Check Into Cash's Conduct Warrants Sanction ....................................23

    II.   The Bankruptcy Court's Award of Punitive and Emotional Distress Sanctions Was Proper ....................................24

        A.   The Bankruptcy Court's Award of Emotional Distress Damages Was Valid Under *Dawson* ....................................24

        B.   The Bankruptcy Court's Award of Punitive Damages Was Proper Because CIC Acted With Reckless Disregard for Snowden's Rights 26

CONCLUSION .......................................................................37

CERTIFICATE OF COMPLIANCE ....................................................37

# TABLE OF AUTHORITIES

## Cases

*Apex Hosiery Co. v. Leader*, 310 U.S. 469 (1940) ........................................... 12, 15

*Arlington Central School Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291 (2006)...........18

*Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994).12

*Dewsnup v. Timm*, 502 US 410 (1992) ....................................................................15

*Dole v. United Steelworkers of Am.*, 494 U.S. 26 (1990) ........................................19

*Exxon Shipping Co. v. Baker,* 554 U.S. 471 (2008) ...............................................27

FAA v Cooper, 566 U.S. __, 132 S.Ct. 1441 (2012)............................. 10, 15, 16, 22

*Griffin v. Oceanic Contractors, Inc.*, 458 US 564 (1982) ......................................21

*Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. __, 130 S. Ct. 2149 (2010).....19

*Havelock v. Taxel (In re Pace)*, 159 B.R. 890 (9th Cir. B.A.P. 1993) ....................16

*In re Bloom*, 875 F.2d 224 (9th Cir. 1989) .............................................. 26, 27, 28

*In re Dawson*, 390 F. 3d 1139 (9th Cir. 2004)..................................... 10, 22, 24, 25

*In re Friedman*, 466 B.R. 471 (B.A.P. 9th Cir. 2012).............................................14

*In re Glannon*, 245 B.R. 882 (D. Kan. 2000) ..........................................................19

*In re Grine*, 439 B.R.461 (Bankr N.D. Ohio 2010)................................................23

*In re Jan Weilert RV, Inc.*, 315 F.3d 1192 (9th Cir. 2003) ....................................26

*In re Roman*, 283 B.R. 1 (B.A.P. 9th Cir. 2002) ....................................................26

*In re S. Cal. Sunbelt Developers, Inc.*, 608 F.3d 456 (9th Cir. 2010) ....................21

*In re Shade*, 261 B.R. 213 (Bankr. C.D. Ill. 2001) .................................................37

*In re Siharath*, 285 B.R. 299 (Bankr. D. Minn. 2002)..................................... 13, 14

*Lorillard v. Pons*, 434 US 575 (1978) ....................................................................11

*Metropolitan Stevedore Co. v. Rambo*, 515 U.S. 291 (1995).................................12

*Morissette v. United States*, 342 U.S. 246 (1952)...................................................18

*Protectus Alpha Nav. v. N. Pacific Grain Grow.*, 767 F.2d 1379 (9th Cir. 1985) .11, 27

*Rodriguez v. Compass Shipping Co.*, 451 U.S. 596 (1981).....................................12

*Rossi v. Motion Picture Ass'n of America*, 391 F.3d 1000 (9th Cir. 2004).............18

*Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983) ...................................................19

*Smith v. Wade*, 461 U.S. 30 (1983) ................................................................. 11, 27

*Stern v. Marshall*, 564 U.S. __, 131 S. Ct. 2594 (2011) ............................ 10, 21, 22

*Sternberg v. Johnston*, 595 F.3d 937 (9th Cir. 2010) ...................................... passim

*Telemark Development Group, Inc. v. Mengelt*, 313 F.3d 972 (7th Cir.2002) .......23

*United States v. Idaho*, 508 U.S. 1 (1993) .............................................................18

*United States v. Rutherford*, 442 U.S. 544 (1979) ................................................12

*US v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) ......................................................22

## Statutes

11 U.S.C. § 105 ......................................................................................................23

11 U.S.C. § 303(i) ............................................................................................ 10, 21

11 U.S.C. § 327 ......................................................................................................17

11 U.S.C. § 328 ......................................................................................................17

11 U.S.C. § 362(k) .......................................................................................... passim

15 U.S.C. § 1114(2)(D)(iv) .....................................................................................20

17 U.S.C. § 512(f)(2) ....................................................................................... 13, 20

28 U.S.C. § 1920 ....................................................................................................18

## Other Authorities

H.R. Rep. 109–31 (2005) .......................................................................................14

N. Oman, *Why There Is No Duty to Pay Damages:  Powers, Duties and Private Law*, 39 Fla. St. U. L. Rev. 137 (2011) .................................................................21

## Rules

F.R.Bankr.P. 7054 .................................................................................................18

F.R.Civ.P. 54 .........................................................................................................18

## Treatises

2B N. Singer & J. Singer, *Sutherland on Statutory Construction* §49.9, pp.121–129 (rev. 7th ed. 2012) ......................................................................................... 11, 12

# COUNTER-STATEMENT OF FACTS ON CROSS-APPEAL

In its brief, Check Into Cash ("CIC") made a number of statements about her actions and character in its brief that are contradicted by the evidence.

## A. Snowden Did Not "Threaten" CIC

CIC contends that "[o]n November 26, 2008, Snowden cancelled her check and called the branch to threaten bankruptcy if it tried to collect the debt." Appellee's Br. 11. Snowden actually testified that she merely "told them that [she was] thinking about filing for bankruptcy," with no suggestion that her decision to file would hinge upon any collection activities on the part of CIC. ER 263. CIC's own call records corroborate this testimony, noting that Snowden "[s]aid she has been talking to an attorney and may file bankruptcy. Will let us know." ER 98.

## B. Snowden Did Not Act Improperly By Listing CIC as a Creditor At the Address At Which It Lent Her Money

CIC implied that Snowden acted improperly when filing bankruptcy by listing it as a creditor at the address of its Sequim branch, and suggests that she bears some responsibility for the fact that CIC's corporate office remained unaware of the bankruptcy for some time after filing. Appellee's Br. 11–12. In fact, Snowden acted properly by listing CIC at the store address given at the top of the consumer loan agreement she signed. ER 73. CIC did not contest the propriety of this action until it filed its brief, and has not provided any evidence to suggest that

either Snowden or the bankruptcy court should have known that Check Into Cash of Washington, Inc., as the business is formally known, prefers to receive legal notices at an address in Tennessee.

### C. Snowden Was Not Obligated To Inform CIC's Collection Agents About Her Bankruptcy Filing

CIC's description of its 12 post-petition collection calls to Snowden implies that Snowden was somehow at fault for not discussing her bankruptcy with the collection agents during any of these calls. Appellee's Br. 11–12. Snowden, her attorney, and the bankruptcy court had all done due diligence in informing CIC of the bankruptcy filing. Snowden provided a reasonable explanation of why she did not want to mention her filing within hearing of her coworkers, superiors, and patients. Appellant's Br. 12. She was under no obligation to discuss her bankruptcy filing with collection agents who were calling her at work to harass her. If anything, she went farther than necessary by informing the callers that she was represented by counsel—information that they declined to make use of.

### D. Check Into Cash Misconstrues the Facts To Impeach Snowden's Claim of Emotional Distress

While CIC is entitled to put on a defense against Snowden's claims of emotional distress, its brief misconstrues the facts in a number of places, employing a tone that has no place in a section titled "Statement of the Facts."

CIC claims that Snowden's emotional distress is belied by the fact that she took "no time off work due to stress or panic." Appellee's Br. 14. In fact, Snowden's financial difficulties in late 2008 followed a knee injury that caused her to miss work. ER 140–151; Appellant's Br. 10. The lack of income Snowden suffered when she was unable to work was what led her to seek out CIC in the first place. Taking additional time off from work would have been self-defeating, especially considering the precarious financial situation she faced following CIC's unlawful withdrawal.

Snowden testified about the emotional distress she experienced when she was unable to buy shoes and a haircut for her daughter. ER 283. However, she was subsequently able to buy these items, after her next payday. ER 328. CIC uses this fact to argue that Snowden did not suffer significant emotional distress. Appellee's Br. 14. CIC has either misunderstood or misrepresented the point of Snowden's testimony. CIC unlawfully debited Snowden's account on February 19, with the transaction completing on the 20th. ER 13, 283. Snowden was paid six days later, on the 25th. ER 327–328. Snowden's emotional distress came when she faced having to tell her daughter that they could not have the outing they had planned for that day because a payday loan company had unlawfully seized her money.

In a particularly egregious misrepresentation, CIC claimed that Snowden said that the harassing telephone calls she received were "not 'such a big thing'".

Appellee's Br. 15. As the transcript of Snowden's testimony proves, she actually

said the opposite:

> Q [CIC attorney Amit Ranade] . . . But you never filed any kind
> of motion to stop these calls?
> A [Snowden] I wasn't aware that would make a difference.
> Q    And when you did file a motion for sanctions in this case, it
> says nothing at all about the calls, does it?
> A    I didn't know I was supposed to tell them about the phone
> calls.
> Q    And your declaration says nothing about the phone calls,
> does it?
> A    I did not know I was supposed to tell them. I didn't know it
> was such a big thing.
> Q    Right, exactly. It wasn't such a big thing.
> A    *It is a big thing*, because when you come out of the room,
> it's a burden to leave everything behind . . . and to walk to the phone
> to answer the phone every time. I don't know if you've ever seen a
> nurse work. . . . Not only are you leaving that room to come answer
> the phone, you're putting a patient on hold.

ER 318–319 (emphasis added).

CIC's characterization of Snowden's attitude toward their harassing phone

calls is blatantly false. "I didn't know it was such a big thing" is very different

from "not such a big thing." In fact, when counsel for CIC attempted to put words

in Snowden's mouth to the effect that "it wasn't such a big thing," Snowden

immediately contradicted him and said that it was. Snowden's ignorance of the

sanctionable nature of CIC's phone calls does not excuse CIC from responsibility

for having committed the violations in the first place.

### E. *Check Into Cash Falsely and Maliciously Accuses Snowden Of Committing the Crime Of Bribery*

In its brief, CIC claimed that Snowden offered Christina Smith a "bribe," which Smith declined. Appellee's Br. 14. This is frankly libelous, and opposing counsel is fortunate that the judicial proceedings privilege prevents Ms. Snowden from seeking redress for it. The bankruptcy court ruled that Snowden's testimony was more credible than Smith's. ER 39, 63. It is inconceivable that the bankruptcy judge could have ruled this way if he had believed that Snowden had offered Smith a bribe to submit false testimony to the court over which he presided. Citing the bankruptcy court's ruling regarding Snowden's credibility, the district court gave its approval to that ruling when it affirmed the bankruptcy court's decision awarding emotional distress damages. ER 4.

The bankruptcy court is the fact finder in this matter. It put the question of Smith's accusations thoroughly to rest when it found Snowden credible and awarded her emotional distress damages, a ruling that the district court upheld. By attempting to relitigate this question now, CIC is improperly inviting this Court to take on the fact finder role.

## SUMMARY OF THE ARGUMENT

In its response, Check Into Cash fails to demonstrate that Snowden does not deserve fees on appeal. The decision of this Court in *Sternberg v. Johnston*, 595

F.3d 937 (9th Cir. 2010), ignored the doctrines of acquiescence and reenactment in analyzing the congressional intent behind 11 U.S.C. § 362(k)(1), failing to follow the clear precedent that Congress was aware of when it amended § 362 but left what is now § 362(k)(1) intact. In light of the decision of the Supreme Court in *FAA v. Cooper*, 566 U.S. ___, 132 S. Ct. 1441 (2012), it is clear that the *Sternberg* court erred in relying on the *Black's Law Dictionary* definition of "actual damages". 11 U.S.C. § 362(k) is a fee-shifting statute, and the terms "costs" and "attorneys' fees" are terms of art that should be interpreted as such. There are many examples of similar fee-shifting statutes that do not contain "prevailing party" language. Section 362(k) is most comparable to 11 U.S.C. § 303(i), which allows for damages including attorney fees in the prosecution of parties for wrongfully instituting an involuntary bankruptcy case. Under *Stern v. Marshall*, 131 S. Ct. 2594 (2011), bankruptcy courts are prohibited from deciding the types of "ordinary damages" actions that the *Sternberg* court thought were most akin to  362 actions. The bankruptcy court's award of emotional distress damages clearly meets the test laid out in *In re Dawson*, 390 F. 3d 1139 (9th Cir. 2004). CIC misconstrues the *Dawson* decision to add additional factors beyond the three prong test that Snowden clearly satisfied. The bankruptcy court's award of punitive damages was proper because CIC acted with a reckless or callous disregard for Snowden's rights. No showing of actual malicious intent is required,

and Snowden met the test under *Smith v. Wade*, 461 U.S. 30 (1983) as incorporated

by *Protectus Alpha Nav. v. Pacific Grain Grow.*, 767 F. 2d 1379 (9th Cir. 1985).

# ARGUMENT

## I.   CHECK INTO CASH FAILS TO DEMONSTRATE THAT SNOWDEN DOES NOT DESERVE FEES OR SANCTIONS

### A. The Court's Decision in *Sternberg v. Johnston* Regarding Attorneys' Fees Is Invalid and Must Be Overturned

In its response brief, CIC defended the legal foundation of *Sternberg v.*

*Johnston*, 595 F.3d 937 (9th Cir. 2010), and its applicability in denying Snowden

the attorneys' fees she has incurred litigating CIC's automatic stay violation. CIC's

arguments are invalid in several respects.

### *Congress Reenacted Section 362(k) in 2005*

"Congress is presumed to be aware of an administrative or judicial

interpretation of a statute and to adopt that interpretation when it re-enacts a statute

without change." *Lorillard v. Pons*, 434 US 575, 580 (1978). A substantial body of

judicial thinking, known variously as legislative inaction, legislative acquiescence,

or by other names, holds that a legislature's failure to modify a statute in the face

of a widespread uniform judicial interpretation of the statute constitutes acceptance

of the interpretation. *See* 2B N. Singer & J. Singer, *Sutherland on Statutory*

*Construction* §49.9, pp.121–129 (rev. 7th ed. 2012). A related doctrine, that of

legislative reenactment, applies the acquiescence theory specifically to cases in

which the legislature has reenacted the statute in question but declined to alter it in a way that would invalidate the interpretation. *See id*. §49.9 at 110–121. When a statutory construction "has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *United States v. Rutherford*, 442 U.S. 544, 544 n. 10 (1979) (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 489 (1940)) (internal punctuation omitted).

The acquiescence and reenactment doctrines have their share of critics. Courts have historically tended to take a dim view of acquiescence in cases in which there are multiple conflicting judicial interpretations in the case law, or in which the judicial precedent amounts to a single case. *See, e.g.*, *Metropolitan Stevedore Co. v. Rambo*, 515 U.S. 291 (1995); *Rodriguez v. Compass Shipping Co.*, 451 U.S. 596 (1981). In recent years, the Supreme Court has on occasion been particularly skeptical of acquiescence arguments that do not involve the statute in question being reenacted within a relevant time period. *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 185–186 (1994).

In this case, however, the factors that disturbed previous courts are not present, and in fact this case stands as a prime example of the applicability of the reenactment doctrine. Bankruptcy courts nationwide universally interpreted 11

12

U.S.C. § 362(k)[1] as a fee-shifting statute from 1984, when Congress added it to the bankruptcy code, until 2008, when this Court handed down the *Sternberg* decision. Counsel for Snowden have searched in vain for *any* case decided between 1984 and 2005 that substantiated *Sternberg*'s preferred reading of § 362(k). As far as can be determined, such cases simply do not exist.

CIC contends that courts were not uniform in interpreting § 362(k) as a fee-shifting statute prior to 2005. Appellee's Br. 28. In support of this argument, CIC cites *In re Siharath*, 285 B.R. 299, 306 (Bankr. D. Minn. 2002), in which the court found that § 362(k) permits "recovery of damages *including* attorney's fees, not damages *and* attorney's fees" (emphasis in original). Snowden does not disagree with the *Siharath* court's interpretation of § 362(k). She does not dispute that, under the statute, fees are awarded as a component of damages, rather than as the result of an event. *Compare* 17 U.S.C. § 512(f)(2) (limiting fees to damages incurred "as the result of" misrepresentation). The question at issue here is whether those damages include fees incurred throughout the process of seeking redress for the stay violation—but for which, no fees would be incurred at all. The *Siharath*

---

[1] Congress originally enacted 11 U.S.C. § 362(k) in 1984 as § 362(h). In 2005, Congress redesignated § 362(h) as § 362(k)(1), and added a related subsection, § 362(k)(2). As with other briefs in this matter, this brief refers to both the pre- and post-2005 provision as § 362(k) throughout to minimize confusion.

court is silent on this question.[2] Given its failure to cite any case other than *Siharath* in support of its argument, it appears that CIC's search for cases contradicting the fee-shifting view of § 362(k) has produced the same unsuccessful result as Snowden's.

It is against this backdrop of total uniformity in the courts that Congress in 2005 undertook the most significant revision to the bankruptcy code since the current code's adoption in 1978. The "Bankruptcy Abuse Prevention and Consumer Protection Act of 2005" (BAPCPA) was passed and signed into law in response to what the bill's drafters considered "[the] lack of personal financial accountability, the proliferation of serial filings, and the absence of effective oversight to eliminate abuse in the system." H.R. Rep. 109–31, 2 (2005). To this end, the act made extensive modifications throughout Title 11, most or all of which had the effect of making the code friendlier to creditors. *In re Friedman*, 466 B.R. 471, 485 (B.A.P. 9th Cir. 2012) (Jury, J., dissenting). The act even modified the former § 362(h) itself, redesignating the original provision § 362(k)(1) and adding an additional subsection, § 362(k)(2), carving out a partial exemption to

---

[2] If anything, the *Siharath* decision should be taken as compelling evidence in favor of construing § 362(k) as a fee-shifting statute. Debtor/Plaintiff Siharath sought enhanced attorneys' fees in excess of the normal lodestar amount. Citing a number of precedents, the judge ruled that the level of complexity of Siharath's case was not sufficient to warrant enhanced fees. That the court bothered to go through this process at all, while saying nothing about Siharath's right to *ordinary* fees incurred through the litigation process, demonstrates clearly that the court was not entertaining *Sternberg*'s preferred interpretation of § 362(k).

14

§ 362(k)(1) on behalf of entities acting in "good faith." 11 U.S.C. § 362(k)(2). If BAPCPA is not an example of a statute being "fully brought to the attention of the public and the Congress," it is difficult to imagine what could be. *Apex Hosiery*, 310 U.S. at 489. Yet § 362(k)(1) itself, with more than 20 years of judicial precedent behind it, was not changed, and remains unmodified to this day.

The evidence in favor of the legitimacy of the pre-*Sternberg* interpretation of § 362(k)(1) is clear and compelling, and this Court should recognize that Congress has effectively given it its imprimatur. "When Congress amends the Bankruptcy laws, it does not write on a clean slate." *Dewsnup v. Timm*, 502 US 410, 419 (1992) (internal punctuation omitted.)

### *CIC Misrepresents Snowden's Position on* FAA v. Cooper

In its brief, CIC claimed that Snowden cites *FAA v Cooper*, 566 U.S. __, 132 S.Ct. 1441 (2012), to argue that "all decisions citing Black's Law Dictionary are fatally flawed." Appellee's Br. 20. This is blatantly false. Whether CIC agrees with it or not, Snowden's argument is quite clear:

> In *FAA v Cooper*, the Supreme Court rejected the definition of "actual damages" from *Black's*, which it characterized as "general (and notably circular)," and concluded that the definition of "actual damages" in numerous federal statutes is unclear in isolation. The term "takes on different meanings in different contexts," it encompasses nonpecuniary damages in some statutes, and is more narrowly tailored in others."

Appellant's Br. 19–20 (quoting *Cooper*, 132 S.Ct. at 1449) (internal citations omitted).

Snowden makes no pronouncements anywhere about "all decisions citing *Black's Law Dictionary*." Rather, she notes that the specific definition used by the *Sternberg* Court as the cornerstone of its decision has been explicitly rejected by the Supreme Court as being general and unclear.

CIC claims that the definition that the Supreme Court has rejected is incidental to *Sternberg*'s interpretation of the phrase "actual damages." Appellee's Br. 25. In fact, the *Sternberg* decision makes it plain that the *Black's Law Dictionary* definition is central to its interpretation. Citing the Bankruptcy Appellate Panel's interpretation of "actual damages" in *Havelock v. Taxel (In re Pace)*, 159 B.R. 890, 900 (9th Cir. B.A.P. 1993), the Court turned to the dictionary to conclude that the panel's interpretation was mistaken:

> In contrast, we conclude that the plain meaning of "actual damages" points to a different result. The dictionary defines "actual damages" as "[a]n amount awarded . . . to compensate for a proven injury or loss; damages that repay actual losses." BLACK'S LAW DICTIONARY 416 (8th ed. 2004). *Following this definition*, the proven injury is the injury resulting from the stay violation itself. Once the violation has ended, any fees the debtor incurs after that point in pursuit of a damage award would not be to compensate for "actual damages" under § 362(k)(1).

*Sternberg*, 595 F.3d at 947 (alteration in the original) (emphasis added).

*Sternberg*'s entire fees holding flows from the *Black's Law Dictionary* definition that the Supreme Court has rejected as being circular and general. *Cooper*, 132 S.Ct. at 1449. The dictionary definition leads the *Sternberg* Court to an understanding of actual damages that is significantly narrower than the one that

16

bankruptcy courts had used to inform their fee decisions for 25 years. Without it, *Sternberg*'s chain of reasoning starts in a different place, and likely ends in a different place as well.

*"Actual Damages" Has No "Special Meaning" in Bankruptcy Law*

In attempting to make its case that § 362(k)'s inclusion of attorneys' fees within "actual damages" has "special meaning" in bankruptcy, CIC argues that "[l]awyers must obtain court approval before they perform work for the debtor if they expect to receive compensation from the debtor," and that this eliminates a procedural obstacle for counsel getting paid under 11 U.S.C. §§ 327 and 328. This argument makes no sense. Section 328 states that "The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment." However, neither § 328 nor § 327 govern the employment of counsel *by the debtor*. Because counsel for the debtor in a chapter 7 bankruptcy filing is not required to be employed under § 327, there is no procedural obstacle that § 362(k) could be relieving debtors of. The provision only makes sense as a fee-shifting statute.

## B. 11 U.S.C. § 362(k) Is a Fee-Shifting Statute

> [A]n individual injured by any willful violation of a stay
> provided by this section shall recover actual damages, including costs

17

and attorneys' fees and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k)(1).

"Costs" and "attorneys' fees" are well-known terms of art that appear in countless federal statutes, rules, and case law. *See, e.g.*, *Arlington Central School Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 297–298 (2006). "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Morissette v. United States*, 342 U.S. 246, 263 (1952); see also *Rossi v. Motion Picture Ass'n of America*, 391 F.3d 1000, 1004 n. 4 (9th Cir. 2004). The plural noun "costs," when it appears without elaboration or, especially, when paired with "attorneys' fees," is well known to mean costs associated with litigation—as opposed to the term "expenses," for example. *See e.g. United States v. Idaho*, 508 U.S. 1, 8 (1993) (observing that "'costs' are those items of expense incurred in litigation that a prevailing party is allowed by rule to tax against the losing party"); *see also Arlington*, 548 U.S. at 298 (noting that "costs" is distinct from "expenses"). This sense of "costs" is evident in F.R.Civ.P. 54, which governs how costs and attorneys' fees may be awarded to the prevailing party in federal litigation in the absence of statutory guidance.[3] *Sternberg*'s

---

[3] Notably, F.R.Bankr.P. 7054 incorporates Rule 54 and applies it to bankruptcy adversary proceedings and, through F.R.Bankr.P. 9014, contested matters. 28 U.S.C. § 1920, which governs the taxation of costs in federal litigation where a

interpretation of § 362(k) as excluding costs associated with litigation—exactly what "costs" is traditionally taken to mean—is difficult.

According to the doctrine of *noscitur a sociis*, "words grouped in a list should be given related meaning." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990). Therefore, because "costs" are authorized at any point in the trial court proceedings, and because nothing in the statute suggests that costs and attorneys' fees should be given different meanings, attorneys' fees, too, should be recoverable. *See In re Glannon*, 245 B.R. 882, 894 (D. Kan. 2000).

### *Fee-Shifting Statutes Do Not Require "Prevailing Party" Language*

CIC states categorically that "[w]hen Congress decides to shift fees, it does so in a separate clause with clear language referring to a prevailing party." Appellee's Br. 26. In fact, the United States Code offers many examples of fee-shifting statutes that do not contain this language. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. __, 130 S. Ct. 2149, 2157 (2010). Various fee-shifting provisions in federal statues make reference to "successful" litigants, authorize district courts to award attorneys' fees where "appropriate," or give courts "discretion" to award fees to either party as they see fit. *Id.*[4]

---

cost-shifting statute is not applicable, also clearly holds with the definition of "costs" as meaning litigation costs.

[4] In the absence of explicit "prevailing party" language, courts have generally required parties to demonstrate some level of success on the merits before awarding attorneys' fees. *Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983). Even at that, 11 U.S.C. § 362(k) limits attorney's fees to individuals "injured by any

*Section 362(k)'s Language Is Not Unique*

CIC also states that "the phrase 'actual damages, including costs and attorneys' fees" appears nowhere else in the United States Code." Appellees' Br. 27. While this is narrowly true if the word "actual" is included, the phrase "damages, including costs and attorneys' fees" does appear in 17 U.S.C. § 512(f)(2) and 15 U.S.C. § 1114(2)(D)(iv), dealing with copyright and trademark law respectively. In this light, CIC's argument that the novelty of the language should be taken as indicative of Congress' intent to distinguish § 362(k) from other fee-shifting statutes is invalid.

*Section 362(k) is Comparable to Section 303(i)*

CIC makes much of Sternberg's holding that "a damages action for a stay violation is akin to an ordinary damages action, for which attorney fees are not available under the American Rule." Appellee's Br. 21 (quoting *Sternberg*, 595 F.3d at 948). But CIC neglects the fact that enforcement of the bankruptcy stay is nothing more than an injunction by another name, rendering an action for failure to adhere to it most akin to an action for specific performance, not one for ordinary damages.

---

willful violation of a stay." There can be little doubt that an individual who is eligible to recover damages under this standard has by definition prevailed to a significant degree in the matter at hand, and there can be no doubt that Snowden falls into this category—else CIC, as cross-appellant in this matter, would have nothing to appeal.

When a creditor wrongly repossesses a car, what the debtor wants first and foremost is the return of their car. Similarly here, when a debtor continues to be harassed by collection phone calls post-petition, she primarily wants the calls to stop. In another scenario, how could a full "tender" cure or remedy a stay violation when it is well established that "tender" does not cure a tort or breach of contract? N. Oman, *Why There Is No Duty to Pay Damages: Powers, Duties and Private Law*, 39 Fla. St. U. L. Rev. 137 (2011). In short, the comparison to an ordinary damage claim is inapposite, and further support for it comes from the bankruptcy court's lack of Article III court jurisdiction to make final decisions on common law causes of action. *Stern v. Marshall*, 564 U.S. __, 131 S. Ct. 2594, 2600–2601 (2011). "[I]nterpretations of a statute that would produce absurd results are to be avoided, if alternative interpretations consistent with the legislative purpose are available. *Griffin v. Oceanic Contractors, Inc.*, 458 US 564, 575 (1982).

So if a damages action under § 362(k) is not comparable to an ordinary damage claim, then what is it best compared to? The most obvious candidate is 11 U.S.C. § 303(i), which addresses fee-shifting in involuntary bankruptcies. In *In re S. Cal. Sunbelt Developers, Inc.*, 608 F.3d 456 (9th Cir. 2010), this Court found that "[l]ike other fee-shifting provisions . . . eligibility for fees turns on the merits of the litigation as a whole, rather than on whether a 'specific filing' is well founded," *Id.* at 462—which is also true of § 362(k). *S. Cal. Sunbelt* takes care to

21

explain that *Sternberg*'s comparison of § 362(k) actions to ordinary damages actions eliminates it from consideration as a fee-shifting statute. *Id.* at 464. But between *Cooper*, which invalidates the foundational definition *Sternberg* uses to classify § 362(k) actions as ordinary damages actions, and *Stern*, which bars Article I tribunals like bankruptcy courts from hearing ordinary damages actions in any event, it is difficult to see any remaining reason why § 362(k) should not be considered fee-shifting under *S. Cal. Sunbelt*.

### C. CIC is Wrong About *Sternberg*'s Applicability to Snowden

CIC's characterization of Snowden's argument against the applicability of Sternberg as "an attack at the second step in a review for abuse of discretion" is incorrect. Appellee's Br. 36. The question of when a stay violation is "remedied" is an issue of clear error, not abuse of discretion. *In re Dawson*, 390 F.3d 1139, 1145 (9th Cir. 2004). The bankruptcy court misapplied the *Sternberg* holding to the facts. *US v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009).

Unlike a ruling that is reviewed for an abuse of discretion that can be determined by a fact finder, whether an unpaid offer can stop a stay violation is not a factual question, but rather one that is central to the automatic stay.

To the same effect, CIC errs when it characterizes its May 20, 2009 offer to Snowden as a "tender." ER 37. A "tender" has distinct elements: 1) an unconditional offer of payment, and an 2) actual production of the amount due on a

specific debt or obligation. *In re Grine*, 439 B.R.461, 467–468 (Bankr N.D. Ohio 2010); *Telemark Development Group, Inc. v. Mengelt*, 313 F.3d 972, 978 (7th Cir.2002). Neither of those elements were satisfied by CIC's email message. It repeatedly referred to itself as an "offer" and a "counter-offer," not a tender, and uses conditional language such as "would." ER 108. More importantly, when Snowden rejected the offer, CIC never produced the funds until after the trial for damages in November 2010. ER 44, 138–139, 161–162. The offer was not a tender, and should not be considered a remedy of the stay violation.

### D. Check Into Cash's Conduct Warrants Sanction

Check into Cash is arguing a lack of due process for sanctions that they have not received from the court, and for briefing and documents that are not in the court record. The issue of sanctions under 11 U.S.C. § 105 and under the court's inherent authority were causes of action addressed by the court and the district court at all levels. The only evidence in the record concerning the Complaint is the Court's findings of fact and conclusions of law; any discussion of matters not in the record are displaced.

## II.  THE BANKRUPTCY COURT'S AWARD OF PUNITIVE AND EMOTIONAL DISTRESS SANCTIONS WAS PROPER

CIC has appealed the district court's decision upholding the award of emotional distress and punitive damages to Snowden. This Court should disregard CIC's arguments and uphold the damages awards.

### A. The Bankruptcy Court's Award of Emotional Distress Damages Was Valid Under *Dawson*

CIC contends that the bankruptcy court's award of emotional distress damage did not meet the test established by this Court in *Dawson*, 390 F.3d, in two ways: because the bankruptcy court applied the wrong standard, and because it applied the elements of the *Dawson* test disjunctively rather than conjunctively. Appellee's Br. 57–63. CIC's interpretation of the test from *Dawson* is faulty.

Taking the second argument first, CIC notes that *Dawson* requires that to be entitled to emotional distress damages, the debtor must "(1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation of the automatic stay." *Dawson*, 390 F.3d. at 1149. Emotional harm may be clearly established in any of three ways: through corroborating medical evidence, through the testimony of non-experts, or if the creditor acted egregiously or it is obvious that a reasonable person would have suffered significant emotional harm. *Id*. at 1149–1150.

24

CIC does not dispute the bankruptcy court's finding that the treatment to which it subjected Snowden meets the reasonable person standard from *Dawson*. What CIC contends is that Snowden somehow manages to satisfy the second of *Dawson*'s three prongs (clearly establish significant harm) without satisfying the first (suffer significant harm). CIC interprets *Dawson*'s restatement of its test later in the decision using slightly different words as a refinement of the test, and somehow concludes that Snowden must show harm "from both the subjective and objective point of view"—concepts that appear nowhere in *Dawson*. Appellee's Br. 62. To this end, CIC once again attempts to bring in its discredited charge that Snowden fabricated evidence, which both the bankruptcy and district courts rejected.

CIC's reading is tautological: an individual can prove she suffered significant emotional harm if she can prove she suffered significant emotional harm. That this Court is under no obligation to entertain an absurd reading of its own past decision is self-evident. Regardless, there is no reason to suppose that any of the three prongs of the *Dawson* test have not been met. Snowden testified as to her emotional distress, which the bankruptcy court found to be both credible and corroborated by the reasonable person standard. ER 63–64. CIC's argument that the bankruptcy court used the wrong standard in establishing emotional distress is an unsuccessful effort to invalidate this finding.

25

**B. The Bankruptcy Court's Award of Punitive Damages Was Proper Because CIC Acted With Reckless Disregard for Snowden's Rights**

"The bankruptcy court's assessment of damages under § [362(k)] is reviewed for an abuse of discretion." *In re Roman*, 283 B.R. 1, 7 (B.A.P. 9th Cir. 2002). "This [C]ourt must accept the bankruptcy court's findings of fact unless upon review [it is] left with the definite and firm conviction that a mistake has been committed." *In re Jan Weilert RV, Inc.*, 315 F.3d 1192, 1196 (9th Cir. 2003). CIC contends that the Bankruptcy Court erred by applying the lower "willful violation" standard rather than actually applying the "reckless or callous disregard standard." The evidence shows otherwise.

In its decision, the bankruptcy court stated the following:

> Regarding punitive damages, their role is to deter misconduct. It's appropriate in the context of a stay violation when there's *a reckless and callous disregard for the law or the rights of others* or where the conduct is malicious, wanton or oppressive.

ER 40 (emphasis added).

Although not cited in the oral decision, the highlighted language appears in *In re Bloom*, 875 F.2d 224, 228 (9th Cir. 1989), a Ninth Circuit bankruptcy case that is clearly apposite. Under the *Bloom* standard, bankruptcy courts are directed to grant punitive damages for violations of the automatic stay arising out of 11 U.S.C. § 362(k) "in appropriate circumstances." *Id*. The *Bloom* Court's decision includes dicta requiring a higher state of mind for the punishment, but the heightened *mens rea* required by the standard is met by the showing of a "reckless

or callous disregard for the law or rights of others"—the same standard used by the bankruptcy judge in this case to award punitive damages to Ms. Snowden. ER 40–41.[5]

The *Bloom* Court's holding relies on the Ninth Circuit case *Protectus Alpha Nav. v. N. Pacific Grain Grow.*, 767 F.2d 1379 (9th Cir. 1985), which incorporates a long line of federal case law on punitive damages that culminates in *Smith v. Wade*, 461 U.S. 30 (1983), finding that punitive damages under federal law can be awarded for conduct which manifests "reckless or callous disregard" for the rights of others. *Smith*, 461 US at 51.

In *Smith,* the Defendant argued that, even if the statute at issue did "not require a showing of actual malicious intent for an award of punitive damages, such a showing should be required" because "the deterrent and punitive purposes of punitive damages are served only if the threshold for punitive damages is higher in every case than the underlying standard for liability in the first instance." *Id.* at 51. But, as the *Smith* Court points out, punitive damages are never awarded as a matter of right, and there are in fact several causes of action where the *mens rea* required is the same as that required for underlying liability. *Id.* at 53–54. The

---

[5] CIC cites *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 493 (2008) to suggest that punitive damages should be limited to actions that are "outrageous,' owing to 'gross negligence,' 'willful, wanton and reckless indifference for the rights of others,' or behavior even more deplorable." However, the quoted text is dicta, and is therefore irrelevant to determining the appropriateness of punitive damages in this case.

Supreme Court's ultimate holding was twofold: "We hold that a jury may be permitted to assess punitive damages . . . when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally protected rights of others. We further hold that this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness." *Id.* at 56. Contrary to CIC's claim, therefore, the *mens rea* required for an award of punitive damages need not be greater than the *mens rea* required to find a violation of the statute.

CIC argues that upholding the bankruptcy court's ruling is tantamount to telling creditors to "expect punitive damages on top of actual damages every time they violate the automatic stay, no matter how innocent the mistake."[6] Appellee's Br. 17. If CIC is advocating that the *Bloom* precedent be overturned, it should say so. If not, it should recognize that *Bloom* controls in this jurisdiction and limit itself to arguments about whether or not the *Bloom* standard is met.

### CIC's Reckless Disregard for Snowden's Rights

The bankruptcy court specifically found that "CIC's conduct here qualifies under the authorities that both parties have cited as reckless disregard for the rights of consumers who file for bankruptcy relief." ER 41. CIC has expounded

---

[6] Notably, CIC's insistence that "[p]olicy and equity considerations have no place in statutory construction," Appellee's Br. 34–35, does not prevent it from making an entirely policy-based argument here about the woeful effects the bankruptcy court's punitive damages award will have on the lending industry if upheld.

repeatedly and adamantly about its highly detailed policies and procedures designed to honor the automatic stay. Yet the picture that emerges from the evidence, including CIC's own testimony, is of an institution whose business processes and corporate culture are manifestly ill-equipped to respond to even basic, uncomplicated bankruptcy filings. Its policies and practices, both written and unwritten, create roadblocks to the free flow of information between and among its departments and branches about its customers' bankruptcy filings. When informed of a bankruptcy, CIC responds with obstinate and dilatory tactics that appear designed to put CIC's unjust enrichment first and the integrity of the federal bankruptcy system last.

As Snowden made the difficult choice to file for bankruptcy, she made every effort to responsibly keep CIC informed of her plans, as evidenced by her many contacts and notifications in the record. Prior to filing, Snowden went to CIC and informed them that she was going to file bankruptcy and that she did not want them to cash her check. ER 301. It was the CIC customer representative who suggested to her that she should put a stop payment order on the check. *Id*. Afterward, Ms. Snowden called CIC every day to confirm her intentions until she filed. ER 153.

After the CIC branch office initiated a mandatory regular charge-off, the collections department resumed collection activity. On February 11th, 2009, when

CIC made one of its post-petition phone calls to Snowden, she asked them if they had heard from her attorney. ER 102. Nobody at CIC made any contacts with the branch office to see if Snowden had filed bankruptcy, or trying to determine if she in fact had an attorney. Instead, CIC continued making collection calls.

Shortly after learning that her funds had been taken from her account by CIC on February 20th, 2009, at the advice of her attorney, Snowden visited CIC's Sequim branch, explained that she had filed bankruptcy, and requested her money back. CIC told Snowden someone would call her. ER 159–160. Nobody from CIC called her, so she returned to the branch, put her attorney on speakerphone with the clerk, and again asked—personally and through her attorney—that her funds be returned. ER 160–161. CIC refused. ER 161.

CIC's charge-off procedures for delinquent accounts seem tailor-made to allow bankruptcy cases to fall through the cracks. Its handbook for branch offices requires that accounts that are more than 30 days past due be forwarded to CIC's collections department as a regular charge-off. ER 79. When this is done, the only thing that is forwarded to the corporate collections office is the postdated check the debtor offered as security on the loan. ER 411. The accounts of the debtor's interactions with the branch as preserved in the branch's collection logs, including information about her upcoming bankruptcy filing, remain at the branch and are not passed on to corporate headquarters. Why? In CIC's belief, "there's no reason

to." ER 508–509. Later, if the branch receives notification that the customer has filed a bankruptcy, CIC has no apparent procedures for ensuring that either the notification or the branch's customer records get passed up the chain.[7]

Some of the strongest evidence of the inadequacy of these processes, and of CIC's procedures for dealing with bankruptcies in general, can be found in CIC attorney Lauren Hosie's testimony regarding CIC's receipt of the court-issued notice of Snowden's bankruptcy filing (the so-called "341 notice"). Hosie testified that

> the bankruptcy notice went to the collections department. There was no letter accompanying that from an attorney or any other information, just quite simply, the notice that's issued from the Court. So when I spoke with [CIC collections department head] Eric Ratcliff about receiving that, he said, quite simply, We got no other information except for that form in the mail. We made a notation of it. That account had been closed for a couple of months. So we had no way of knowing exactly when that customer filed for bankruptcy.

ER 420.

As with all such notices, the 341 notice sent to CIC and Snowden's other creditors lists the date of the bankruptcy filing near the top of the first page, in boldface type that distinguishes it from information around it. ER 85. In this light,

---

[7] Each branch is eligible for bonuses based on the number of active accounts that they service and that are paid on time. ER 504. Regular charge-offs count against this number, unlike bankruptcies that the branch handles during the 30-day window. *Id*. In the absence of policies requiring that branches inform corporate headquarters about bankruptcy filings even after a regular charge-off, the fact that the branch would have already "taken the hit" on the charge-off must surely serve as a disincentive against the branch passing the information along on its own initiative.

Hosie's testimony that "we had no way of knowing exactly when [Snowden] filed for bankruptcy" is very strange, especially in light of her subsequent testimony that "I asked Eric Ratcliff to tell me what he received, and he said—he's familiar with—he's seen one of these before, so it was simply the court-issued notice." ER 439. If Ratcliff was familiar with 341 notices, he certainly should have known where to look for the filing date. Even a person who had never seen a 341 notice before should have had no trouble finding it.

Of course, this assumes that the document about which Hosie was testifying was in fact a 341 notice. Hosie repeatedly testified that CIC's collections department first learned of Snowden's bankruptcy filing on April 14, 2009, and that the department learned about the bankruptcy through the receipt of the 341 notice. *See, e.g.*, ER 436, ER 540. However, the notice itself was delivered to CIC's Sequim branch office via first class mail on January 22, 2009—nearly three months before Hosie testified to receiving it. ER 87. On the other hand, as the bankruptcy judge himself noted, Snowden's initial motion for sanctions—which CIC denied ever receiving—was sent via certified U.S. mail to CIC's post office box in Cleveland, Tennessee on April 9, 2009, just five days before CIC's

Cleveland-based collections department acknowledged being notified of the

bankruptcy. ER 540–541.[8]

It is worth pausing briefly here to take stock of the documentation situation

as of mid-April 2009. When the initial motion for sanctions was sent to Cleveland,

a copy was also sent to the CIC branch in Sequim. ER 24–25. If Hosie's testimony

is to be believed, *both* of these notices subsequently went missing, coincident with

the remarkable reappearance of the three-month-old 341 notice. If, as seems more

likely, the document to which Hosie was referring was the initial motion for

sanctions, then the copy sent to the branch was lost, while the copy sent to

Cleveland was received but misinterpreted by CIC as a notification of filing and

not responded to. Either way, two of these three court documents were lost and

remain missing today, and it was not until Snowden's second motion for sanctions

a month later that she finally succeeded at getting the attention of anyone at CIC.

So just what did the collections department log on April 14, 2009—the 341

notice, or the motion for sanctions? Unfortunately, there is no way to know for

sure, because CIC did not retain a copy of that document. ER 439. Indeed, since

the only surviving evidence of this notification that CIC has been able to present is

a row in Snowden's electronic customer file, ER 102, it remains unclear whether

---

[8] It should also be noted that on the initial motion for sanctions, Snowden's filing
date was given at the bottom of the first page. ER 169. Whichever document the
collections department received on April 14, therefore, Hosie's insistence that CIC
had "no way of knowing" when the bankruptcy was filed is hard to take seriously.

CIC's Sequim branch ever transmitted a copy of the 341 notice to the central office at all. Far from being an isolated snafu, it appears that CIC's central office expected or even encouraged its branches to discard court-issued bankruptcy notices in some cases, as Hosie testified:

> Q. What's the center supposed to do when it receives a bankruptcy notice, whatever the status of the account is?
>
> A: If it's—well honestly, I mean, if it's a customer's account that they haven't had a loan with—and sometimes you'll get a bankruptcy notice of somebody who hasn't done business with us in several months, then they'll just disregard that notice. That customer didn't have a loan out during the applicable period. I think sometimes people get us confused with other companies.

ER 541–542.

Given Hosie's and Ratcliff's apparent unfamiliarity with the standard 341 notice, one might speculate that CIC's local stores discard the notices far more often than they transmit them to the central office. But perhaps that is to be expected, given CIC's lack of any formal policies for remedying automatic stay violations that they commit:

> Q [Snowden attorney Christina Henry] And so if someone tells you about a bankruptcy, and that money has already been negotiated, then what happens? Is there any procedures in place for any other attempts that—is there any other procedures for handling that situation? . . .
>
> A [Hosie] It's not an official policy. Honestly, we don't have these requests very often.
>
> Q    It's not an official policy in your office?

34

A    It's not in the operations manual. But it is sort of an unwritten policy that Check Into Cash is not entitled to those funds, and we'd return them.

ER 447.

Other factors that point to the CIC legal department's unfamiliarity with basic bankruptcy procedure are its apparent preoccupation with letters as a mechanism for notification, and its lack of familiarity with the PACER electronic records system used by federal courts, including bankruptcy courts. Hosie testified that when the collections department receives a bankruptcy notification, it enters the bankruptcy into CIC's record and discards the notification, but "[if] a letter accompanied it, they would have forwarded that letter on to [the legal] department." ER 541. Elsewhere, Hosie makes it clear that the letter in question would be a letter from the debtor's attorney. ER 453–454, 525–526. As noted earlier, the 341 notice is the standard mechanism for notifying creditors of a bankruptcy filing, and it is sent directly by the bankruptcy court, not by the debtor's attorney. When asked whether CIC uses PACER to search for and obtain information about bankruptcy filings, Hosie replied that she was "not intimately familiar" with the system. ER 445.

The picture that emerges from Hosie's testimony and the other evidence in this case is of an organization that is in the business of being a short-term, high-interest creditor to a predominantly low-income consumer base, but whose policies for dealing with bankruptcy filings are nonexistent or haphazard at best, with a

central office that is wholly unfamiliar with the most basic instruments of the bankruptcy system, and a culture that condones ignoring court-issued notices based on judgment calls made by low-level staffers. Check Into Cash's behavior and policies amount to wholesale contempt for the federal bankruptcy system, and the bankruptcy judge was correct to sanction it.

Ultimately, it is CIC's own brief that provides some of the strongest arguments in support of the appropriateness of punitive damages. It admits only having committed "an honest and very rare mistake" and proudly touts its "detailed policies that have worked in millions of transactions annually." Appellee's Br. 15, 52. While modestly allowing that its policies and processes may only amount to "near-perfection," Appellee's Br. 56, it gives no indication that it sees anything about them—policies and processes which tolerate the casual disposal of court-issued documents, give its branches no tools for properly dealing with bankruptcies that are filed after a narrow window have elapsed, and make no effort to ensure that crucial customer details are passed along to the right parties—that might be worth changing or improving. The party that comes in for the harshest blame for its stay violation is Snowden herself, for unwittingly notifying CIC of the violation in a manner that, while proper, was not altogether to its liking. ER 4.

"The primary purpose of punitive damages awarded for a willful violation of the automatic stay is to cause a change in the creditor's behavior; the prospect of

such change is relevant to the amount of punitive damages to be awarded." *In re Shade*, 261 B.R. 213, 216 (Bankr. C.D. Ill. 2001). As CIC's own brief makes clear, it sees nothing in its behavior that is worth changing, and simply will not be persuaded otherwise unless it is confronted with a penalty that is strong enough to make a difference.

## CONCLUSION

Snowden respectfully submits that the district court's denial of attorney's fees in this matter be reversed, and that its judgment in favor of punitive and emotional distress damages be upheld.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i). As reported by Microsoft Word 2010, it contains 8,232 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (6). The body of the brief is set in 14 pt. Times New Roman.

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2013, I electronically filed the Appellant Rupanjali Snowden's Response and Reply Brief for Appellant using the CM/ECF System which will send notification of such filing to the below counsel of record.

| | |
|---|---|
| Amit D. Ranade, WSBA# 34878 | Alexander M. Wu, WSBA# 40649 |
| adr@hcmp.com | amw@hcmp.com |
| Hillis Clark Martin & Peterson, P.S. | Hillis Clark Martin & Peterson, P.S. |
| 1221 Second Avenue, Suite 500 | 1221 Second Avenue, Suite 500 |
| Seattle, WA 98101 | Seattle, WA 98101 |
| Tel# 206-623-1745 | Tel# 206-623-1745 |
| Fax# 206-623-7789 | Fax# 206-623-778 |

DATED this 18th day of November, 2013.

*/s/ Christina L. Henry*
Christina L. Henry, WSBA #31273
Attorney for Rupanjali Snowden